1  for money from the client at a rate
2  in excess of what was reasonably
3  necessary to cover anticipated time
4  commitments, you are essentially
5  building up a reserve that under the
6  contract you could keep, and I think
7  that making requests for that kind
8  of replenishment was essentially
9  stealing from the client. You have
10 no business doing that.
11     Q.   The opinion I'll call it
12 that you just offered regarding this
13 Evergreen arrangement, your basis
14 for that is Attorney Votre's
15 representations to you?
16     A.   Yes.
17     Q.   So, in other words, you've
18 seen no documents --
19     A.   That's right.
20     Q.   -- or testimony or anything
21 to support that?
22     A.   That's right.
23     Q.   I thought you had mentioned
24 maybe there were other facts,

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor    FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

```
 1   multiple facts that you could --
 2        A.    Well, apparently there is
 3   testimony that Mr. -- or Mr. Votre
 4   said to me that Mr. Cohen told Mr.
 5   Zimmerman that if he, Mr. Zimmerman,
 6   didn't accept the deal that that was
 7   proposed in Chicago that he, Cohen,
 8   was going to walk away from the
 9   representation or the substance of
10   that.  If that is true, that is an
11   improper threat of unprofessional
12   conduct, abandoning a client, and
13   it's a form of coercion on a client
14   that is very wrongful.
15              Again, I don't have any
16   documents to establish that, but if
17   it's true, it's a violation of
18   recognized professional standards.
19        Q.    And any additional facts?
20        A.    No, I think that's it.
21        Q.    Are you aware that Mr.
22   Zimmerman is an attorney?
23        A.    I understand that he went
24   to law school and was admitted.  I
```

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103    FAX 215.751.0581
www.JDReporting.com

41

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1    don't think he was a practitioner.
2        Q.    Do you consider someone who
3    is admitted but not practicing to be
4    an attorney?
5        A.    Yes, for some purposes.
6        Q.    Does Mr. Zimmerman's status
7    as an attorney alter your opinion at
8    all in the case?
9        A.    No.   I mean it means he
10   probably had a better idea of what
11   was going on than if he hadn't been a
12   lawyer, but even a lawyer is entitled
13   to facile representation when he's
14   the client.
15       Q.    Professor Hazard, is it
16   your opinion that Attorney Cohen's
17   conduct in this matter fell below the
18   standard of care for a matrimonial
19   attorney practicing in Fairfield
20   County, Connecticut?
21       A.    Sure, or anywhere else in
22   the world.
23       Q.    What is your basis for
24   understanding the standard of care

JDR

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management

215.564.3905      1700 Sansom Street, 5th Floor      FAX 215.751.0581
                  Philadelphia, PA 19103
                  www.JDReporting.com

1  for a matrimonial attorney practicing
2  in Fairfield County, Connecticut?
3      A.  Matrimonial attorneys are
4  governed by the same rules as
5  everybody else.  Lawyers in
6  Fairfield, Connecticut, are governed
7  by the same rules as anybody else
8  in Connecticut.  The rules in
9  Connecticut on this subject are the
10 same as the rules throughout the
11 United States and I believe the rules
12 everywhere else in the world.  So I
13 don't think there's anything special
14 about being a marital lawyer or
15 anything special about being in
16 Fairfield.
17     Q.  And what are the particular
18 rules on which you rely?
19     A.  Rule 1.5 of the model rules
20 of ABA which are adopted in
21 Connecticut under Rule 1.5 of the
22 Connecticut rules of professional
23 conduct.
24     Q.  Any other additional rules

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103    FAX 215.751.0581
www.JDReporting.com

1  to Rule 1.5?
2      A.   No.  I mean, on additional
3  matters I've talked about, the
4  coercion of a client and so on, that
5  would involve other principles, for
6  example, Rule 1.16, but talking about
7  the subject addressed in this
8  opinion, that's it.
9      Q.   I think you've said this,
10 Professor Hazard, but just so I can
11 clarify.  The testimony you provided
12 regarding the Evergreen allegation
13 and the coercion/abandoning client
14 threat, those were not considered in
15 forming your opinion as expressed in
16 Exhibit C, right?
17     A.   That's right.
18     Q.   Professor Hazard, Page 2
19 on Exhibit C at the top of the page,
20 there's a carryover sentence that
21 I'll just read.
22          "Mr. Cohen testified that
23 this arrangement was insisted upon
24 by the opposing party in the

1  negotiation, but he acknowledged that
2  it was not agreed to by his client."
3          What is your basis for the
4  statement that Mr. Zimmerman did not
5  agree to the fee agreement?
6       A.   I think that's from the
7  deposition of Mr. Cohen.
8       Q.   Do you have the particular
9  section of the deposition to which
10 you are referring?
11      A.   No. If that statement is
12 incorrect, I could revise my opinion,
13 but my understanding is the client
14 didn't like the idea but signed the
15 agreement.
16      Q.   Do you dispute that Mr.
17 Zimmerman signed the marital
18 settlement agreement?
19      A.   No. Of course he signed
20 it.
21      Q.   Do you dispute that the
22 marital settlement agreement
23 contained a provision outlining the
24 $300,000 payment?

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905      1700 Sansom Street, 5th Floor      FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

45

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1   A.   I think it was in there,
2   yes.
3       Q.   Do you dispute then that
4   Mr. Zimmerman reviewed that portion
5   of the agreement before signing it?
6       A.   No, I assume he did.
7       Q.   Have you drawn any
8   conclusion then, Professor Hazard,
9   about Mr. Zimmerman's now disputing
10  something to which he agreed in
11  writing?
12      A.   No, because I think it was
13  improper -- it might have been a
14  good, a prudent decision by Mr. Cohen
15  to agree with the opposing counsel
16  about this $300,000 for each of them.
17  It was, I think, on balance a prudent
18  decision by Mr. Zimmerman to sign the
19  agreement even so, but that didn't
20  mean that it was right for Mr. Cohen
21  to keep the money, which is what this
22  lawsuit is about, because that
23  violated the terms of the agreement
24  he had with Mr. Zimmerman.

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905   1700 Sansom Street, 5th Floor
Philadelphia, PA 19103   FAX 215.751.0581
www.JDReporting.com

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1  Q.  Is your testimony then, Professor Hazard, that essentially the wrongful act here by Attorney Cohen was the acceptance of the $300,000?

6  A.  No. I think in the circumstances he could have accepted it, but he should have offered to restore it to Zimmerman Properties, or, he can't collect it. It was a strategy suggested and asserted by the opposing party. I think it was obviously in violation of the fee agreement that Mr. Cohen had with Mr. Zimmerman. That said, if it's the only way you can get the deal done, I said I think it was prudent for Cohen to agree to it and for Zimmerman to accept it, but that doesn't mean it's right for Mr. Cohen to keep the money.

22  Q.  We are returning to that top paragraph on Page 2, Professor Hazard, which states that there is

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor    fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

1   evidence that Mr. Cohen did not
2   disclose the quote/unquote, bonus to
3   Mr. Zimmerman.
4              What evidence are you
5   referring to in that sentence?
6       A.     I think that there's a
7   dispute between Zimmerman and Cohen
8   as to exactly what was said.  The
9   fact that Zimmerman signed the
10  agreement and was a lawyer indicates
11  that he was aware of it, but there's
12  conflict in the testimony about it.
13  Whatever it is that Zimmerman will
14  say is on the one hand and Mr. Cohen,
15  he says, is on the other hand.  I
16  can't resolve that.  That's why I
17  said there's evidence.
18      Q.     Well, Professor Hazard,
19  wouldn't at a minimum, I'll just call
20  it a bonus, because that's the word
21  you used, isn't there evidence that
22  at a minimum it was disclosed to Mr.
23  Zimmerman prior to his signing the
24  marital settlement agreement?

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor    FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

46

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1  A. I think that's right.
2  Q. And do you dispute that Mr.
3  Zimmerman could have walked away from
4  the payment of that sum by not
5  signing the marital settlement
6  agreement?
7  A. Sure, but that's why I said
8  it probably was prudent in the
9  circumstances to go along with it,
10 because you get the settlement
11 agreement finalized on that basis.
12 Q. If I can just return to
13 this for a second. It's your
14 testimony that there is nothing wrong
15 per se with Attorney Cohen
16 negotiating the $300,000 fee into the
17 marital settlement agreement?
18 A. I don't agree with that. I
19 think it was wrong. I think all
20 things considered that in the
21 circumstances it was a prudent
22 improvisation given the demand, which
23 was kind of peculiar, the demand made
24 by Mrs. Zimmerman. Sometimes you

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905   1700 Sansom Street, 5th Floor
Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

49

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1  are in bargaining and there's an
2  opportunity to reach a final
3  settlement that involves things that
4  you very much would not want to do.
5  I think it was wrong for Mr. Cohen to
6  do it.  That said, I think that going
7  that far was within a reasonable
8  range of professional judgment on his
9  part.  The problem is I don't think
10 he can justifiably keep the money.
11 It was an improvisation acquiescing
12 in Mrs. Zimmerman's demands.
13         Q.    So had Mr. Cohen simply
14 returned the money to the appropriate
15 property, is it your opinion his
16 conduct would not have fallen below
17 the standard of care?
18         A.    Yes, I think so.
19         Q.    So again, it's the act of
20 keeping the money?
21         A.    Yes.
22         Q.    Not the act of collecting
23 the money, not the act of negotiating
24 for the money.  It's the act of

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor    Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

1   keeping the money, that's the real
2   wrong act in this case?
3       A.   Sure.
4       Q.   Is there any circumstance
5   under which Mr. Cohen would have
6   been, in your opinion, entitled to
7   accept the $300,000 payment?
8       A.   Possibly.  If he had done
9   the work reflected and Mr. Zimmerman
10  agreed to it, then there would have
11  been a modification of the original
12  fee agreement.  There's no indication
13  that that was done.
14          MR. SLIFKA:  Can you read
15  that back, please.
16          (The court reporter read
17  the record as follows:
18          "QUESTION:  Possibly.  If
19  he had done the work reflected and
20  Mr. Zimmerman agreed to it, then
21  there would have been a modification
22  of the original fee agreement.
23  There's no indication that that was
24  done.")

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905      1700 Sansom Street, 5th Floor
Philadelphia, PA 19103      fax 215.751.0581
www.JDReporting.com

51

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1  BY MR. SLIFKA:
2      Q.   Is it your opinion that the
3  work Mr. Cohen provided in the case
4  did not entitle him to the $300,000
5  payment or that the retainer
6  agreement did not entitle him to the
7  $300,000 agreement?
8      A.   Yeah, later, he explains it
9  as tax advice.  I understand looking
10 at his time sheets you see he had .4
11 hours for that.  There's no way that
12 that is reasonably covered by
13 $300,000.  I think the tax advice was
14 merely a contrivance to supposedly
15 justify it.  But in any event, it's a
16 substantial additional amount and
17 under the fee agreement what he is
18 supposed to get is the standard
19 hourly rate supported by a rational
20 retainer, but 300,000 is way out of
21 line over what would have been
22 realized on his standard rate.
23     Q.   Would you agree that
24 someone else might opine that by

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905    1700 Sansom Street, 5th Floor    Fax 215.751.0581
                Philadelphia, PA 19103
                www.JDReporting.com

1  signing the marital settlement
2  agreement Mr. Zimmerman consented to
3  the additional fee payment?
4       A.    Somebody might say that.  I
5  think it's coerced consent.
6       Q.    In your opinion, in what
7  manner should Mr. Cohen have conveyed
8  to Mr. Zimmerman the issue of the
9  $300,000 payment?
10      A.    He should have said this is
11 a bizarre requirement but that's what
12 Mrs. Zimmerman wants.  What I suggest
13 is that we agree to it nominally but
14 with the understanding that when the
15 agreement is finalized that the
16 300,000 be restored to Zimmerman
17 Properties, that would be strictly in
18 compliance with the agreement, but it
19 would mean that I am not in a
20 situation of taking fees that I'm not
21 entitled to.  That would have been
22 very straightforward, would have
23 allowed the agreement to go forward.
24      Q.    So is it your testimony

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor    FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

```
 1   that there is no situation in which
 2   Mr. Cohen could have accepted -- I
 3   use your word -- and collected the
 4   $300,000?
 5        A.   It's a violation of the
 6   fee agreement.  Unless you say this
 7   is a modification of it.  And a
 8   modification was done under
 9   conditions of coercion and duress.
10   So in my opinion, Mr. Zimmerman is
11   not thereby agreeing to the
12   additional amount.
13        Q.   You are aware of the
14   factual circumstances of the
15   mediation to the extent that it take
16   place over a week in Chicago?
17        A.   Yes.
18        Q.   You are aware of the many
19   millions of dollars in property in
20   dispute in this marital dissolution?
21        A.   Both of them had a lot of
22   money.
23        Q.   Are you aware of the issue
24   of this matter having potentially
```

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905      1700 Sansom Street, 5th Floor      FAX 215.751.0581
                  Philadelphia, PA 19103
                  www.JDReporting.com

1  proceeded to trial in Nevada had this
2  mediation not been resolved
3  successfully.
4      A.   Sure.  That was a good
5  reason for trying to settle it.
6      Q.   Would you agree then that
7  those circumstances in and of
8  themselves provided a substantial
9  amount of duress?
10     A.   Both sides were under the
11 coercive influence of the risk of
12 trial.  But the specific 300,000 was
13 an additional element of coercion and
14 there's a way in which Mr. Cohen
15 could have handled it professionally
16 and properly and he didn't.
17          (Document marked for
18 identification as Hazard Exhibit E.)
19 BY MR. SLIFKA:
20     Q.   Professor Hazard, I'm
21 showing you what has been marked as
22 Exhibit E.  Do you recognize that
23 document?
24     A.   Yes.  That's the fee

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103    FAX 215.751.0581
www.JDReporting.com

1   agreement.
2       Q.   Let me see if I have the
3   other copy.
4            Would you read the second
5   paragraph of the letter for me and
6   let me know when you are finished.
7       A.   I've read it.
8       Q.   I apologize for taking this
9   back, Professor.
10           That paragraph contemplates
11  the request of an additional
12  reasonable charge for matters of
13  extraordinary difficulty which, or
14  which require special expertise or
15  the giving of special priority
16  treatment.
17           You have seen that
18  sentence?
19      A.   Yep.  Yep.
20      Q.   In your opinion, would that
21  statement allow for additional
22  payments beyond a retainer agreement
23  if agreed to by the client?
24      A.   Yeah, under some -- under

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905   1700 Sansom Street, 5th Floor
Philadelphia, PA 19103   FAX 215.751.0581
www.JDReporting.com

```
 1   appropriate circumstances, certainly.
 2        Q.    If, in your opinion,
 3   properly negotiated with the client,
 4   would that allow for the payment of
 5   what I will call a premium for the
 6   attorney's work?
 7        A.    Well, you have to be very
 8   careful because you can't charge a
 9   contingent fee in a divorce case.
10   Some lawyers essentially try to
11   convert hourly rates into contingent
12   fees on the basis of premium.  That
13   said, under some circumstances, some
14   kind of premium could be appropriate.
15        Q.    What type of premium, in
16   your opinion, would be appropriate?
17        A.    A reasonable amount related
18   to the normal rates being charged.
19        Q.    What information would you
20   use to arrive at what would be a
21   reasonable amount?
22        A.    Well, maybe three or four
23   or five times his normal hourly rate.
24   Not $300,000 as in this case.  That's
```

DEPOSITION OF PROF. GEOFFREY HAZARD, JR., 12/19/03

1  a normal lodestar premium, something
2  like that.   L-O-D-E-S-T-A-R.
3       Q.    Is there a professional
4  standard someplace that provides what
5  you just referred to, as the lodestar
6  premium?
7       A.    Those are the kind of
8  numbers that they talk about in
9  lodestar evaluations.  The baseline
10 is reasonable.  You relate it to what
11 the lawyer's ordinary fee is.  You
12 relate it to what the special
13 expertise is.  And in this case, I
14 don't think there was any technical
15 special expertise, but allowing
16 everything in Mr. Cohen's favor, a
17 premium of three to five times for if
18 there was some additional expertise
19 required, would have been reasonable.
20      Q.    Is it your opinion that the
21 large amount of money and property
22 involved in this dispute did not give
23 rise to I guess special expertise?
24      A.    Absolutely.  I think the

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                     Philadelphia, PA 19103
                     www.JDReporting.com