LEXSEE 2004 US DIST LEXIS 1072

**Applera Corporation and Roche Molecular Systems, Inc., plaintiffs, v. MJ Research Inc. and Michael and John Finney, defendants.**

**3:98cv1201 (JBA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2004 U.S. Dist. LEXIS 1072*

**January 28, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Applera Corp. v. MJ Research Inc., 220 F.R.D. 13, 2004 U.S. Dist. LEXIS 1465 (D. Conn., 2004)* Reconsideration granted by, On reconsideration by *Applera Corp. v. MJ Research, Inc., 2004 U.S. Dist. LEXIS 21100 (D. Conn., Sept. 29, 2004)*

**PRIOR HISTORY:** *Applera Corp. v. MJ Research, Inc., 297 F. Supp. 2d 459, 2004 U.S. Dist. LEXIS 1071 (D. Conn., 2004)*

**DISPOSITION:** Plaintiffs' motion to exclude defendant's evidence and arguments claiming PCR rights are tied to authorized thermal cyclers granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Roche Molecular Systems, Inc, PLAINTIFF: Asim Varma, David Gersch, Michael J Klyce, Jr, Arnold & Porter, Washington, DC USA. James Sicilian, Day, Berry & Howard-HTFD-CT, Hartford, CT USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. Jennifer K Lawson, Mario R Borelli, Day, Berry & Howard, Hartford, CT USA.

For Applera Corp, PLAINTIFF: Edward R Reines, Weil, Gotshal & Manges, Redwood Shores, CA USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. James T Shearin, Pullman & Comley, Bridgeport, CT USA.

For MJ Research, Inc, DEFENDANT: Albert L Jacobs, Jr, Greenberg Traurig, New York, NY USA. Donna Nelson Heller, Harold Bolton Finn, III, Finn Dixon &

Herling, Stamford, CT USA. Joseph B Darby, III, Greenberg & Traurig, Boston, MA USA.

For MJ Research, Inc, Michael Finney, John Finney, DEFENDANTS: Gerard F Diebner, Joseph M Manak, Greenberg Traurig, New York, NY USA. C Allen Foster, Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA.

For MJ Research, [*2] Inc, Counter CLAIMANT: Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA.

For Roche Molecular Systems, Inc, Counter DEFENDANT: James T Shearin, Pullman & Comley, Bridgeport, CT USA.

**JUDGES:** Janet Bond Arterton, U.S.D.J.

**OPINIONBY:** Janet Bond Arterton

**OPINION:**

Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)]

Plaintiffs Applera Corp. and Roche Molecular Systems, Inc. seek to exclude defendant MJ Research Inc.'s evidence and argument that the plaintiffs have illegally tied the rights to practice PCR to the purchase of thermal cyclers sold by licensed suppliers, arguing that as a matter of law, there is no unlawful tie, and that the

2004 U.S. Dist. LEXIS 1072, *

admission of such evidence and argument would confuse the jury. For the reasons discussed below, plaintiffs' motion [Doc. # 667 (2)] is GRANTED.

I. Background

Applera has patented the PCR process in certain fields, and licenses the right to perform PCR on a thermal cycler in its fields in two ways. First, an end user performing PCR on a thermal cycler pays a royalty when purchasing "reagents," or enzymes [*3] used in the PCR process, from Applera or from a licensee of Applera. Second, a licensing fee is paid for each thermal cycler, after which the thermal cycler is referred to as "authorized" for use in performing PCR without violating Applera's PCR process patents. Applera has both end user and supplier authorization programs for licensing "authorized" thermal cyclers. That is, an end user either may buy a thermal cycler that has already been authorized for use in PCR, because the supplier purchased a license through Applera's Supplier Authorization Program ("SAP"), or an end user may purchase an unlicensed thermal cycler and obtain the right to use the thermal cycler to perform PCR through Applera's End User Authorization Program ("EAP"). Applera aggressively seeks suppliers' participation in the SAP, and tells suppliers who refuse to participate that they are at risk of liability for inducing infringement of Applera's PCR Process Patent. As Applera states, the SAP "permits competing thermal cycler suppliers to promote performance of PCR on their machines, conduct which otherwise may induce infringement of the PCR Process Patents, and convey PCR rights to end users with their thermal [*4] cyclers." Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 3.

MJ, a manufacturer and supplier of thermal cyclers, does not participate in the SAP, and claims that the SAP unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully tying thermal cyclers to PCR Process Patent rights.

II. Discussion

MJ raises both procedural and substantive objections to plaintiffs' motion. First, MJ contends that the motion in limine is procedurally inappropriate, as it is no more than a thinly veiled summary judgment motion, targeting not specific evidence but simply legal positions supporting certain claims. The Court has an obligation, however, to admit only "relevant evidence" that is "of consequence to the determination of the action." See Fed. R. Evid. 401, 402. Moreover, even relevant evidence may be excluded if it is substantially outweighed by the risk of confusion of the issues or

misleading the jury. See Fed. R. Evid. 403 [*5] . Since evidence offered in support of non-viable legal claims is not relevant, and carries a substantial risk of misleading the jury, a motion in limine is an appropriate vehicle for obtaining an order of exclusion. See, e.g. United States v. Stop & Shop Companies, Inc., 1984 U.S. Dist. LEXIS 22103, 1984 WL 3196, at *1 (D.Conn. Nov. 9, 1984) (granting motion to preclude defendants from offering evidence of economic justification at trial, because it was legally irrelevant). This Court, in fact, invited such motions as a means of narrowing the issues for trial. See May 5, 2003 Status Conference Transcript [Doc. # 679] at 29-33.

The Court recognizes that the plaintiffs previously challenged MJ's tying claim in its January 19, 2001 Motion for Summary Judgment on MJ's Antitrust and Patent Misuse Claims [Doc. # 399], which was denied by then-presiding Honorable Dominic J. Squatrito on March 28, 2002. See Memorandum of Decision and Order [Doc. # 624]. However, while Judge Squatrito found that there were disputes of material fact at issue as to some parts of the defendant's antitrust claims, his ruling did not address the particular tying claim now before the Court. n1 As a result, [*6] the Courts finds that it is appropriate to rule on the plaintiffs' motion in limine. n2

n1 At the pre-trial conference on January 22, 2004, defendant's counsel expressed a concern that the Court would not have the benefit of the parties' statements of undisputed facts under Local Rule 56(a)(1) and (2) in deciding the motion in limine, and that without these statements, the Court could not take at face value any statement in the briefing as to whether certain facts were undisputed or not. Recognizing that no further discovery on the antitrust matters has taken place since the January 19, 2001 filing for summary judgement, the Court has reviewed the Statements submitted in conjunction with the previous antitrust summary judgment motion in connection with its consideration of this motion in limine. See [Docs. # # 401 and 466].

n2 This ruling precludes MJ from arguing or presenting evidence in support of its tying claim. As MJ has correctly pointed out, the plaintiffs have not identified any particular evidence to be excluded, and this ruling, therefore, does not address the admissibility of specific evidence, recognizing that evidence may be probative of more than one claim.

[*7]

"The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*. To prevail on a tying claim, MJ must establish that (1) the tying and the tied products are separate and distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product. See *id. at 11-16.*

1. Separate Products

The parties agree that the tying product in this case is the PCR Process Patent right, and the tied product is an "authorized" thermal cycler. n3 Thus, MJ's claim is that the plaintiffs have tied the rights to perform PCR to the purchase of authorized thermal cyclers.

n3 See, e.g. Memorandum of MJ Research, Inc. ("MJ") in Opposition to Plaintiffs' Five Motions to Exclude Evidence and Arguments relating the MJ's Antitrust Counterclaims and Patent Misuse Defense ("MJ Opposition") [Doc. # 684] at 15 n. 17.

[*8]

The test for whether two separate products are involved "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish, 466 U.S. at 19.* n4 The issue, then, is whether thermal cyclers that are authorized to perform PCR have a market distinct from PCR Process patent rights. See *id.* Phrased in these terms, the question suggests its answer. If it can be concluded that automated PCR as described in Applera's patent requires the use of a thermal cycler, then the "authorization" of the thermal cycler is the same product as the PCR patent right.

n4 Applera suggests that the test for determining whether there are two separate products is one which looks "to the nature of the claimed invention as the basis for determining whether a product is a necessary concomitant of the invention or an entirely separate product." *Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 670-71 n. 14 (Fed. Cir. 1986).* While this is the test for whether there are two separate products for purposes of patent misuse, the "law of antitrust violation, tailored for situations that may or may

not involve a patent, looks to a consumer demand test for determining product separability." *Id. at 670.*

[*9]

Although MJ has never specifically agreed in its briefing to the Court that the '188 patent (U.S. Patent No. 4,965,188) covers the performance of PCR on a thermal cycler, it has stipulated that the '188 patent covers "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR . . . are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the temperature levels." Joint Stipulation Regarding Claim Construction of the '202, '195, and '188 Patents [Doc. # 640] at P 4. While PCR can be performed without a thermal cycler n5, "automated" PCR, as defined in the '188 patent, can only be practiced on a machine performing the heating and cooling functions. MJ has agreed that a thermal cycler is a machine that performs these functions. See Amended Report of Dr. Almarin Phillips, Oct. 17, 2000 [Doc. # 668, Ex. 2] at 9 ("Thermal cyclers are devices capable of performing the required heating and cooling")(citing Deposition of Michael Finney dated April 17, 2000, at 1069). n6 As MJ acknowledged in a September 25, 2000 submission to the U.S. Patent Office, the '188 patent "claims [*10] the PCR process automated by a thermal cycling machine." Petition to Invoke Supervisory Authority of the Commissioner [Doc. # 688, Ex. 4] at 3.

n5 See Local Rule 9(C)(2) Statement in Support of MJ's Opposition to Plaintiffs' Motion for Summary Judgment on MJ's Antitrust Claims and Patent Misuse Defense [Doc. # 466] at P 3.

N6 See also Local Rule 9(C)(2) statement [Doc. # 466] at P 8 (denying Applera's claim that the '188 patent covers the performance of PCR on a thermal cycler, or "automated PCR" only "to the extent that the phrase 'covers the performance of PCR on a thermal cycler, or 'automated PCR'" includes subject matter not described by claims 9 and 32 of the '188 patent,'" or "to the extent that it implies that MJ or its customers necessarily infringe claims 9 and 32 of the '188 patent."). Claims 9 and 32 of the '188 patent both refer, in relevant part, to a process "wherein the heating and cooling steps . . . are automated by a machine which controls temperature levels, transitions from one temperature to another, and the timing of temperature levels." See [Doc. # 688, Ex. 3]. Thus, MJ does not dispute that the performance of the processes described in claims 9 and 32 of

the '188 patent is done on a thermal cycler machine.

[*11]

Because there is no dispute that the '188 PCR process patent covers the performance of PCR on a thermal cycler, Applera is entitled to license the use of thermal cyclers to perform PCR in the fields covered by its patent in order to protect its patent. For the purposes of the tying claim, then, there are not two separate products, because the PCR process patent right (the tying product) is the same as the "authorization" on the thermal cycler (the "tied" product). There can be no demand for an "authorized" thermal cycler separate and distinct for the demand for a PCR process patent right. See Jefferson Parish, 466 U.S. at 19.

It should be noted, however, that if the "tied" products were thermal cyclers generally, rather than "authorized" thermal cyclers, then there would be a factual dispute as to the demand for thermal cyclers as distinct from the demand for rights to the PCR process patents. "For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one product] separately from [another product]." Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 462, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992) [*12] (citing Jefferson Parish, 466 U.S. at 21-22). Thus, a trier of fact would have to assess the nature of the demand for thermal cyclers separate and apart from their use in PCR.

Neither Applera nor MJ describes the tied product as thermal cyclers generally, however. In fact, MJ's argument about the coercive and anti-competitive effect of the alleged tying scheme relies on the "authorization" aspect of the thermal cycler market. As MJ contends, the "imposition of the requirement of thermal cycler 'authorization' as a condition to obtaining a license for the PCR process alters the competitive dynamics in the thermal cycler market, giving PE a profit on each thermal cycler so authorized and a significant control over the costs of--and therefore, the prices to end users charged by--competing thermal cycler manufacturers. Every 'authorized' thermal cycler is, for all relevant antitrust purposes, a 'PE thermal cycler.'" MJ Opposition [Doc. # 684] at 17. Nonetheless, and inconsistently, MJ also argues that there are two distinct products involved because the Court has previously found thermal cyclers to be "staple goods" with "substantial noninfringing uses." See MJ [*13] Opposition [Doc. # 684] at 16 n. 20. Such an argument implies that the tied products are thermal cyclers in general, not simply thermal cyclers authorized to perform PCR. Thus, to some extent, it appears that MJ seeks to define the tied product one way

for the purpose of determining whether it is separate and distinct from the tying product, but another way for the purposes of determining the other elements of its tying claim.

2. Coercion

Even assuming the "tied" product is in fact a thermal cycler in general, not simply an "authorized" thermal cycler, MJ's tying claim must fail, because there is no evidence that end users have been forced to purchase thermal cyclers that they "did not want at all, or might have preferred to purchase elsewhere on different terms," Jefferson Parish, 466 U.S. at 12, in order to obtain the right to the PCR process patents.

Applera argues that because it sells the rights to perform PCR in its fields on any thermal cycler directly to end users through the End User Authorization Program ("EAP"), the end user is not required to purchase an authorized thermal cycler (or any thermal cycler). Applera has presented evidence that it has "executed [*14] a total of 155 agreements under the EAP with end users of thermal cyclers sold by firms that have not joined [Applera's] Supplier Authorization Program," and that these agreements "confer authorizations for 435 thermal cyclers." Affidavit of Hannelore Fischer in Support of Plaintiffs' Motion for Summary Judgment of MJ's Antitrust Counterclaims [Doc. # 669, Ex. 1] at P 2-3. MJ, while disputing the exact number of agreements executed under the EAP, does not deny that a substantial number of EAP agreements have been reached. See Local Rule 9(C)(2) Statement [Doc. # 466] at P 21 (stating that data "presented by plaintiffs' antitrust expert, Dr. Janusz Ordover, indicates that 124 end users have executed EAP agreements with [Applera]."). Because the EAP program operates independently from the sale of thermal cyclers, and remains a viable way for end users to obtain a license to perform PCR on thermal cyclers, Applera cannot be said to coerce such persons to buy unwanted thermal cyclers.

MJ argues, however, that the EAP itself is an illegal tie, and likens this case to Int'l Salt Co. v. United States, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947), in which the Supreme Court [*15] found it unlawful for International Salt to lease its patented salt dispensing machine to customers on condition that they use only International Salt's products in them. But the lease agreement in International Salt was improper because it required the purchase of a separate product (International Salt's salt) in order to obtain the right to use the patented machine. In contrast, the EAP at issue in this case is a self-contained program. It does not require end users to buy thermal cyclers. Moreover, unlike in International Salt, here it is not disputed that the use of a thermal

cycler to perform PCR is patented. Thus, there is nothing improper about requiring end users to obtain authorization for this purpose.

In the alternative, MJ argues that the EAP is a sham, because Applera has pressured thermal cycler suppliers to join the Supplier Authorization Program ("SAP") by accusing them of inducing infringement of the PCR process patents. If all suppliers join the SAP, then the EAP would not be a sham. As Applera contends, however, even if the SAP were the only authorization program available, there would be no unlawful tie. As the parties agree, automated PCR requires the use [*16] of a thermal cycler. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 688, Ex. 1] at 61. Thus, any end user who wished to perform automated PCR would, by necessity, have to obtain a thermal cycler of some kind. The SAP does not restrict the choices of the end user, because it does not determine which thermal cycler machines are available on the market, nor does it require end users to purchase a particular thermal cycler machine. n7 In this scenario too, then, no end user is coerced into buying an unwanted thermal cycler.

n7 MJ focuses on the anti-competitive effects of the "authorization" requirement. As discussed above, however, an "authorized" thermal cycler is not a separate product from the PCR patent right, and Applera is entitled to a lawful monopoly over its patent.

In the scenario in which all suppliers join the SAP, however, it may well be concluded that an end user seeking to purchase a thermal cycler would be forced to buy unwanted PCR rights. In this scenario, the thermal cycler [*17] would be the tying product and the PCR rights would be the tied product. According to the parties, between 7% and 20% of thermal cyclers are used for purposes other than PCR. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 559, Ex. 2] at 176 ("I would guess of the thermal cyclers that we are currently selling at this point, perhaps 20 percent are never used to perform PCR"); Letter from Joseph Smith, PE to Michael Finney, MJ, Jan. 30, 1998 [Doc. # 671, Ex. 2] at 1 (stating that "worldwide, at least 93% of

thermal cyclers need authorization" and offering to discount the royalty to reflect the 7% of thermal cyclers not used for PCR). These thermal cycler purchasers, then, may be forced to pay for an authorization that they do not want or need. MJ, however, does not allege that such a result is a tie. See, e.g. MJ Opposition [Doc. # 684] at 19 n. 24 ("The imposition of the costs of licensing the PCR process rights on end users who do not need those rights may not technically be a 'tie' . . ."). The PCR Process Patents give the plaintiffs a lawful monopoly on PCR rights and thus, as a matter of law, plaintiffs cannot be found to "unlawfully restrain [*18] free competition in the market for the tied product. . . ." *Coniglio v. Highwood Servs., Inc., 495 F.2d 1286, 1291 (2d Cir. 1974)*. n8

n8 Moreover, the Plaintiffs state, and MJ does not dispute, that as a factual matter, they "do not require competing suppliers licensed through the SAP to convey PCR rights with each thermal cycler they sell," as suppliers may "include authorization notices only for customers who need them." See Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 7; Letter from Joseph Smith to Michael Finney, Jan. 30, 1998 [Doc. # 669, Ex. 5] at 2.

III. Conclusion

For the foregoing reasons, Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)] is hereby GRANTED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 28th day of January [*19] 2004.**